May it please the court, my name is Sam Bondroff. I'm here on behalf of the plaintiff's patents. And as a punitive class of current and former employees of Hewlett-Packard, who are all invested in the Hewlett-Packard 401k plan, and in particular in the employee stock plan. They have brought claims of breach of fiduciary duty and prudence against the fiduciaries of that plan, who include several senior executives of the company, as well as the company itself. There are three things I'd like to talk about here today. The first is the leading cases. Please bring court on what the pleading standard is for claims like this. Fifth Third, Bancorp, the student offer, and Amgen, Inc., the heiress. I want to talk about what those cases meant, and what they set up as the pleading standard for a case like this. And relatedly, second, we need to talk about what those cases did not say. In particular, the Amgen decision, which is a very narrowly decided and very short opinion. We should be careful in how we read it and how we apply it. And third, we need to talk about the actual fraud that is at issue here and that is alleged here, and that underlies the claim of breach of fiduciary duty and prudence. Because after all, it is on that ground that the district court originally granted, which we erroneously, the motion to dismiss. Do we offer, says that for a case like ours, where you allege that you have fiduciaries or insiders who become aware of the artificial inflation of the company's stock to be fraud. If the Argonne clause leaves in a claim of breach of the fiduciary duty and prudence gives them, we must propose an alternative action that they could have taken that meets two criteria. One, it must be consistent with the federal securities laws. Two, it must be one that a reasonable fiduciary would not conclude would be more likely not to do more harm than good to the plan and its participants. Essentially, if you are the fiduciary and you are insider and you become aware of potential fraud, you have to ask yourself the question, okay, can I take an action? Will it be improper under the securities laws or will it be consistent with them? Also, if I do this, am I more likely to harm the plan by doing it or will it do more harm not to take the action? You're weighing the harm versus the good. So would you focus on that? Because it seems to me a large part of your case rests on that, and that is whether a prudent fiduciary could have concluded, for example, that announcing these allegations once the finding was made would actually do more harm than good at that juncture. Yes, Your Honor, that is exactly where the case hinges on. Our contention is that after HP acquired Autonomy in fall of 2011, having done almost no due diligence, they very quickly became aware of the fact that Autonomy had engaged in two key practices to inflate its revenues. One was they bundled hardware sales with software sales to make sales numbers look bigger. Two, they built value-added reseller transactions as revenue,  and it is our contention that when it was plausibly alleged that that fraud or that that information was known to be fake. This is where I get a little confused on your theories here because you seem to be melding both of them. You have, one, this prudence theory seems to talk about the fraud. And I just wanted to see if we're on the same page when we're talking about the fraud here because in one hand you allege fraud based on what they discovered, based on what the whistleblower said. It seems like you're arguing that, but then you're also arguing that there was fraud, I think, based on the integration process that took place. How do you, if you could tell me, when you refer to fraud, are you speaking about the different accounting standards resulted in Autonomy's low value and for HP's bottom line? Or are you referring to the actual fraud committed by Autonomy's former executives in the form of the fake resellers and the bundled hardware sales? Your Honor, we're actually talking about both. It is our contention that the fraud, Your Honor referred to in the second part, the second option, was actually known before the whistleblower came forward in May 2012. But where and how did they know about that? There were these two issues. One came to light when, after the acquisition closed, HP had its own outside auditors, two different auditing firms, Ernst & Young and PMG, as well as the internal senior accounting executive, Paul Curtis, review all of the deployed work papers associated with Autonomy's business. And in doing so, they learned about these reseller transactions and learned that, by withstanding the complexity of those transactions, HP's Q alleged they learned that. Right after the acquisition closed in the fall of 2011. What date? Well, it is the first day of our class period, so it's right after the acquisition closed in October of 2011. And these audits were conducted almost immediately thereafter, and the deployed work papers that were reviewed showed that the way these reseller transactions were treated, being booked as revenue without an end user in sight, which may have been permissible under international accounting rules, it quickly became apparent it was not permissible under U.S. accounting rules. That's where I'm having some trouble, because they now, retrospectively, are going back. They bring people in after October, November 2011. They're now doing an archaeological expedition into the work papers, right? Yes. And it's not clear to me why simply trying to reconcile standards would actually reveal that there was fraud with respect to phony resellers. That's where I'm missing the point, so help me out. It's not that there's fraud related to phony resellers. It's that what HP quickly became aware of, both in learning about these reseller transactions and on-chain sales, was that all the time these revenues were not as high as they had thought. So that comes because of the accounting procedures being reconciled? In part, and because of the way they were treating hardware sales and bundling them with software sales. So does that mean that HP has to disclose any revenue effects caused by the normal process of integrating the acquisition or acquisition? Is that what you're saying? There's authority for that, if that's the case, because you also allege that HP never informed the public about the differing accounting standards that were resulting in lower revenue, but it seems like that's exactly what HP did in filing that fine. Did you inform him? It also seems it attributed to its poor performance. What HP did not disclose was that it had determined and had learned that these two practices were the reason for the poor performance. You say these two practices? Bundled hardware sales and reseller transactions, and that, therefore, HP had massively overpaid for autonomy. And they said this when? This is what they learned in the fall of 2011. After they went back? After they went back. So we're trying to get something before then to pin your allegations on, because I'm just having trouble understanding why somehow going back and seeing how you might optimize these accounting systems is evidence that they knew or should have known before. Well, it's not that they knew or should have known before. It's that when they went back and ordered and reviewed the toy work papers, they first learned that autonomy had a practice of bundled hardware sales, and that Deloitte had flagged that as a key risk related to reporting revenue higher than it was. And so they immediately should have realized this is a practice that is designed to make autonomy's revenues look better than they are. We paid for this company based on those numbers that we thought were legitimate, and now we are seeing that they had a mispractice that inflated those revenues. Therefore, we paid too much of the company. But they did not disclose that fact for another year. So the other what else could they have done prior to the whistleblower coming forward is to disclose it. That's what you're saying. Yes. But earlier than the IQ 10 that was filed in the 50s? Yes, 2012. Markham Clayton? Yes. Then when they should have disclosed, and then what would your damages be? They should have disclosed on each of the dates set forth in our complaint when a securities filing was made, the quarterly statements and 10-K statements that were released during the class period. Each one of those securities filings represents a missed opportunity to correct the fault. The damages here are simply for those people who purchased the stock at artificially inflated prices because they did so, and no matter what the stock does in the future, they missed out on the potential profits they otherwise would have received. So how does the whistleblower come into play? What's your theory of fault brought here? Because you allege that if it is covered up, autonomy's low value results in different accounting standards, and you also alleged it was the whistleblower who forced the defendants to file a complaint about the fraud. But the information that the defendants, or that the whistleblower defaulted, is not safe information, or is, I guess, the defendants supposedly concealed the whistleblower, at least from my review, seem to have informed HP that autonomy, the executives that have committed fraud through bundled hardware sales and the phony sales to resellers, he told them that not that the different accounting standards would impair the value of autonomy once HP had adjusted autonomy's revenue to conform to the GAAP standard. I'm just trying to reconcile. It seems kind of inconsistent to me, or not following your theories here. We don't think that it's inconsistent. First of all, we don't know all of the whistleblower divulged in May of 2012, and it is not possible for us to know that without any fact discovery. However, it is our contention that most of what the whistleblower disclosed, including the nature of the reseller transactions and the bundled hardware sales, was confirming what the defendants already knew, and that essentially the whistleblower forced them to disclose it to the public after conducting yet another investigation because they could no longer quietly unwind this and pretend like they hadn't really moved massively over paid for it. What they knew is that focused on this October, November 2011 Do you have respect to reconciliation? Yes. Do you want to say the remaining words? I do. Yes. Thank you. Good morning, Your Honors. I'm Mark Woleski from Washington. I'll try and cover everything in the time allotted, 12 minutes, but if I miss something, Mr. Schatz and Mr. Munk will jump in. It will be three minutes if they preserve. Your Honors, I think you focused on exactly the right issue. Let me just jump right in. The theory of the complaint, the fact we now know from the indictments that have been filed against Mr. Vercetti in the SEC's cease and desist order against Mr. Egan is that he was the victim of a fraud, and what the plaintiff is trying to do is claim the victim for being the victim of the fraud. The argument is that HP knew shortly after the deal closed that it had been the victim of a fraud, and that that claim fundamentally is implausible. The principal thing you've heard about to establish that HP knew about the fraud shortly after the closing is that HP's auditors, Princeton Young, had access to the Deloitte workpapers. Deloitte approved all of the transactions that they now see HP knew was fraudulent. Deloitte approved the hardware sales as inappropriate, and Deloitte did not flag any issue with respect to the sales transactions. So the principal, just to pick up your point, what did HP know after the deal closed? HP knew that Autonomy's auditors had signed off on these transactions. So as the plaintiff's alleged here that the fraud appears, the revenue loss results include a differing accounting standards, and I'm just trying to kind of figure out the disconnect between the plaintiff's theory and your responses on the deal, because in your arguments, in your brief, focus on what I would call arguably criminal fraud committed by Autonomy's former executives in the form of their resellers and the local hardware sales, so help me understand your view of the plaintiff's allegation. Absolutely, Your Honor. This is not an issue about differing accounting standards. A phony sale is a phony sale is a phony sale. That's true under IFRS. That's true under CAP. So what HP knew going into when the deal closed was that there was going to have to be a reconciliation between what IFRS permitted and what CAP permitted. And that's why you see in one instance there's a note in the record that HP was going to have to recognize the sale over time rather than the time that it was going to be considered. There could be timing differences. But a phony sale under IFRS is a phony sale, and what HP learned after whistleblower number four came forward was not that there were timing differences, reconciliation differences, but there were sales that were actually fraudulent, and that's the essence of the indictment against Mr. Tasneem and Mr. Tasneem's son. In the other part, sometimes with the fraudulent sales, I think their allegation is the way you price and book the hardware and software value. And that, to me, seems... If I understand what he's saying, so I'd like you to respond to it, what he's saying is, well, that, of course, is going to give you... You're going to overpay if you actually understand how these sales have been booked and calculated. And that HP should have known this as a fault of the laboratory. By looking at these papers, among other things. Yes, HP knew that there were hardware sales, but HP knew from the work papers that the hardware sales were legitimate. There was a loss associated with the hardware sales. That was booked to SG&A Sales General and the administration. As a commotion, the sales were presented to HP as a way to entice customers to buy software. And Deloitte signed off on them on that basis. If HP took a major hit in its software segment immediately after acquiring Autonomy, then shouldn't this... Some types of growth have put you or HP on notice that Autonomy's numbers may have been inaccurate? Very difficult, Your Honor. The stock went down after its sales passed because there was a percentant. But through the retrospect, HP had overpaid. The stock did not go down because people believed that HP had bought a fraudulent company. No, but that goes back to my point, is that he's arguing, well, if you overpaid and you had a bad company, you should have known that by looking at how these sales and how they book between a hardware loss and a software profit, so to speak. Two very different things. The stock went down on the announcement of the deal because of a perception that HP had overpaid. Not because the world believed that Autonomy was a fraudulent company. Not fraudulent, but he's saying if you'd known how they were stating things, then you would have known in terms of pricing. How would you know? That the due diligence was conducted before the deal was closed. The due diligence did not reveal a fraud. So certainly no fiduciary knew going into the deal that there was a problem with the underlying... Maybe not as a fraud, but maybe those... For example, that there was enough information that it should have been more suspect than it was. I mean, there was a Financial Times article that the plaintiffs cited that indicates that early on it's identified because loss-making hardware sales as a key risk. Are you still divided within this? But did HP executives also notice that Autonomy was inflating the software revenue with these bundled hardware sales? I think, again, you have to be careful on when the theory of the... Let's start a time frame. Let's start when the deal is announced. The theory of the complaint is not that the executives... The theory of the complaint is that the executives had inside information that they should have acted upon. At the time the deal was announced, there was no inside information. The deal was done on the basis of public information and due diligence. So going into the deal, the executives had no knowledge of the fraud. You have to start with the premise that maybe they knew there was a fraud going into the deal. So... Did you finish? No, but your question is more important than my answer. Okay, well, no, not when it's answering my colleague's question. So let me finish and come back. Looking at this later time period, the later time period after the deal closed, they have access to Deloitte's work papers. They learned that Deloitte has signed off on these transactions. No inside information. That would put an insider on knowledge who had an insider to believe that the stock was inflated. And that's ultimately the problem with the briefings theory. They have to put knowledge in the insiders that the stock was inflated. And that doesn't happen until whistleblower number four. Four, a new autonomy executive who comes forward after Mr. Lynch and this is Mr. Hussien about the company, who sees the writing on the wall, who sees the jig is up, exposes this, and elements of the fraud in that jurisdiction investigation. Counsel, isn't it sufficient, under John Lennon at all, that there are plausible reasons for HP to have covered up autonomy's bad practices? Aren't you, in effect, arguing that the court should choose between two equally plausible explanations for what happened? And the reasons for this plausibility analysis is pretty obvious, and I think it being heard to say face after negotiating an expensive and controversial bill to ward off litigation in the hopes that it could quietly wind down bad practices. These have essentially been pleaded, have they not? So, how do you explain that it's insufficient pleading because of the plausibility analysis? I think there are two reasons. First, the plausibility hinges on the idea that the insiders knew that there was an underlying fraud. Without that, there's no motive to do anything. And that's really the fundamental failure in this case. There's no factual allegation, specific factual allegation, that puts it in the company's head or certainly not in the individual's head that they knew before whistleblower number four they were victim of a fraud. Second, as to plausibility, look at how these people acted after the fraud became, after whistleblower number four came forward. They didn't bury their heads in the sand. They didn't client foster a con fraud. They hired Morgan Lewis. They hired PricewaterhouseCoopers. They conducted a thorough investigation. And the only thing that the plaintiff can say in response to what actually happened, in response to the revelation, is that it was an act of theater. Pricewaterhouse did not lend its name to an act of theater. And furthermore, they reported the fraud to the Department of Justice, the SEC, and the Serious Fraud Office. Serious Fraud Office. People who commit for covering things up don't call in the cops to look in to see, discover that they had covered up. And of course, now we know, which we didn't know before Judge Breyer, is that the people who committed the fraud actually haven't, aren't being held accountable to it. In our analysis under 8.0 and 12.8, are we supposed to be considering them? Yes. The 28B. And the 28A. Yes. There is authority for your honor to consider it. I can get it to you afterward. I have it. My colleague will send it. You can consider it like a citation or an allegation. No. I wonder if we should, because after all, an indictment is an allegation. And there was no admission by Mr. Heathen, Autonomous Former Head of Sales, in the specific system of order. The admission, so to speak, is an $800,000 payment of disproportionate profits that he wasn't committed to. I think that's an $800,000 admission. The authority that your honor can take traditional notice of public records, including indictments, is Mangio Reschina v. Prince of Penzone, 849 F. 3rd, 11th Avenue. In HP experience, it looks like three-quarters of core performance. After the acquisition, the law moves in and explains that it was due to, and this phrase is used repeatedly throughout the rate, due to a lower mix of license revenue and higher acquisition-related deferred revenue write-downs and integration costs associated with autonomy acquisition. I just want to make sure I understand what that means. Yeah, what it means is that's what the executives of HP believed was happening at autonomy. The sales didn't, let's go back and look at that, the deal closed, and new controls were put in place at autonomy so that the fraudulent practices, without the fraudulent practices, the revenues went down, and HP had no reason to go back to prior quarters to see, well, where were those revenues? Why aren't we seeing those revenues? The explanation from the autonomy executives are it's harder for us to close deals. Revenues aren't quite showing up, but they're coming, they're coming. Mr. Lips, Mr. Hussain, had thrown out the company in April. It wasn't until it comes forward in May and asked them the truth when it comes from the open. And there's no reason, in order to speak to your point, which is a good point, there's no reason to believe that the executives had any motive to cover up a fraud that was being, that occurred, being perpetrated by the people who were then later thrown out of the company and the truth when it comes from the open. And HP also, also conducted 23 audits, is that right? No, that's an overstatement. The real forensic audit happened when PricewaterhouseCoopers came in at the end of May. After the whistleblower. After the whistleblower. The prior work was just routine integration work. Okay, you know, how are we going to book revenues in accordance with GAAP and monitor changes? So when you say that fraudulent practices stopped, what time frame are you pegging that to? Fraudulent practices essentially stopped shortly after the deal was done because HP is attacking people's hard-earned bucks. And so I do not use this word. And so in response to Mr. Bonderoff's statement that according to the date on which HP should have known after the acquisition and while it was integrating, see what was going on, or, you know, what's your response to that? It's very simple. What HP knew was that revenues were short and that's what then was disclosed in the 10-Q. The 10-Qs that precede whistleblower number four. How did you have to disclose that earlier? The revenues shortfalls were disclosed on a timely basis, quarter by quarter. What was not disclosed was when whistleblower number four came forward. What was not disclosed was that, hey, we have an allegation from a former permanent employee that there may be more here than meets the eye. And that disclosure is not made until PricewaterhouseCoopers finishes its work, and that takes six months. And Judge Breyer examined that, and I think the case law is extremely clear that a corporation has the right, in fact the obligation, to take its time, do an investigation, and assure itself that it knows that the allegations are correct and is in a position to quantify them. Thank you. I'd like to leave some time for my colleagues. Well, you're taking all the time, but because this always happens when you split time, fair warning, and you know that. I'm not going to give them their time because I hate to see Nancy Moyers realizing that their time is fading away. So, Leo, the investigation has two minutes. Yes. Thank you, Your Honor. My wife would be disappointed if we didn't get to see some of this. The allegations as to Ms. Westrack are particularly plausible. She jeopardized her career by closing the deal in the boardroom and suggested signing out. She would have turned a blind eye to the subject of Friday's funeral, which is nonsensical. The fringe piece here, the fallacy in her argument in general and in certain ways to Ms. Westrack is that they plead no facts. As to Ms. Westrack, the plaintiff's side had one article or one source to get attention to. They reference business as usual when you integrate a company, analyses, but there's not a single allegation that Ms. Westrack brought on the board. It wasn't until Mr. Bowler came forward later on and at that point HP did exactly what they should have. Ms. Westrack did exactly what they should have. Let's have an investigation. Let's determine to see if this proposal is credible. Is the allegation real? Is it overblown? So you can put some parameters of argument in this accurate picture. Thank you. Thank you. Thank you, Your Honor. Just very briefly, I want to give a hug. I represent Mr. Levine, Mr. Murren, and Mr. McMullen. I want to make sure that it's clear what it is that the plaintiff's claiming my clients should have done and what they should have disclosed. Paragraph 1 of the Second Amendment Complaint says that fraud that HP ultimately disclosed in November of 2012 was known shortly after the acquisition and that's what the defendants have disclosed. Not anything else but the fraud that allegedly had occurred prior to the acquisition. The problem is, with respect to all defendants and certainly as to my clients, is that there is no faxable content in the language of their claim. There is no faxable content to show that any of my clients, Mr. Murren, Mr. McMullen, or Mr. Levine, ever had knowledge of that until whistleblower number 4 arose in May of 2012. And that's the plaintiff's obligation. So to Your Honor's question about whether or not there are, there's a plausible theory here. It has to be a plausible theory based upon faxable content. And we submit that there isn't any faxable content. As to any of the defendants, certainly not as to my client, from which the plaintiffs can say that the possibility that they couldn't fiduciaryly not have acted the way my clients did can be foreclosed and that's the standard that's required by first, third, and mansion. They need to show that no reasonable trick fiduciary would have acted as these defendants did. They haven't done that. Thank you. Thank you. Do I have time to ask a question? I'll make three quick points. First, again, to clarify, the fraud here, what caused the artificial inflation of the stock is that the defendants realized soon after the acquisition closed that the revenues were inflated at a time because of these two practices and that, therefore, they had overpaid another company. Whatever other fraud that has led to criminal indictments that's going on in the economy, that part was known. They could have and should have correctively disclosed that as soon as they knew it. Second, we are arguing so many facts here. We are talking about, okay, the counsel's getting up and talking about, well, this is what caused the stock price, not this. This is what so-and-so knew, not this. All of them are facts that are not in the complaint. The facts that are in the complaint are being brushed aside, and we are being asked to consider criminal indictments and SEC consent orders, which are not appropriate and would not even pass Rule 201B of the Rules of Evidence at this point, let alone considering them in light of the ball and tomahawk. Third, let's remember what is actually at issue here. This is a risk. This is not the federal securities laws. A risk is supposed to be the highest duty known to the law. These people are supposed to be going the extra mile for their clients, and what we are setting up here is a world in which you owe a greater duty to the shareholder on the street than you do to your fiduciary wards. That can't be right, and there's nothing in Dudenhofer or Anzin to suggest that that's what the Supreme Court wanted. Most of Dudenhofer is made up of the Supreme Court saying the much presumption was too defendant-friendly and made it impossible to complete these claims. Anzin simply said in two sentences, one, a claim that was included, three, Dudenhofer does not correctly exceed our standards, and two, the Ninth Circuit, this court's changing of the language of more harm than good into uninformed was not appropriate. It did not talk about any of the other parts of this court's decision in the Anzin opinion, and those parts of the decision are absolutely salient today. If there is a known fraud, if the fiduciaries know, not suspect, if you suspect there's fraud, yes, you might think it would do more harm than good to disclose because you don't know the full extent of it, but once you know that there's fraud, you have to act and make the correct disclosure. The securities laws compel it, and ERISA compels it, and this court's reasoning in Anzin still holds true, that you could not possibly believe it would do more harm than good to disclose a fraud earlier rather than later, because the more time passes, the more people are buying at inflated prices. So if this court decides that our opinion has failed under Anzin, we ask for leave to amend. It's set forth in our 28-J letter. When Anzin first came out, it came out after this was briefed, and to the extent it is a European state law, we ask for the opportunity to repeat it if this court finds that we have failed under the standard of Anzin, but I would submit that we have not. Thank you. I have a question. You looked at it, and the expert that will be in for a call, just as you looked at it,
judges: McKeown, Murguia, Rufe